UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DENNIS FRENCH, LYNN FRENCH,
DR. BRENDA O'MALLEY,
CATHERINE WILT, VERN BARKEL,
and JOYCE BARKEL,

      Plaintiffs,

v.                                                                                                   Case No. 1:07-CV-817

ESSENTIALLY YOURS INDUSTRIES, INC.,                          HON. GORDON J. QUIST
ESSENTIALLY YOURS INDUSTRIES CORP.,
ESSENTIALLY YOURS INDUSTRIES
(Canada), INC., RONALD BOERSEMA,
and DONNA BOERSEMA,

      Defendants.
_____/

## OPINION

Plaintiffs, Dennis French, Lynn French, Dr. Brenda O'Malley, Catherine Wilt, Vern Barkel, and Joyce Barkel, have sued Defendants, Essentially Yours Industries, Inc. ("EYI"), Essentially Yours Industries Corp. ("EYIC"), Essentially Yours Industries (Canada), Inc. ("EYI Canada"), and Ronald Boersema and Donna Boersema (the Boersemas), alleging a claim for violation of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§ 77a, *et seq.*, for failing to register the "Precious Metals Program: The Code Blue Profit Sharing Plan" (the "Code Blue Plan") as required by Section 5(a), 15 U.S.C. § 77e(a), of the 1933 Act.  In addition, Plaintiffs allege state law claims of fraud, violation of the Michigan Consumer Protection Act, M.C.L. §§ 445.903, *et seq.*, innocent misrepresentation, breach of contract, and violation of the Michigan Uniform Securities Act, M.C.L. §§ 451.701, *et seq.*  Presently before the Court is Defendants' motion to dismiss and for summary

judgment on Plaintiffs' 1933 Act claim, in which Defendants contend that the claim must fail because the Code Blue Plan is not a security. Although Plaintiffs have not filed their own motion for summary judgment, they have submitted materials in opposition to Defendants' motion and request in their response that the Court grant them summary judgment on the issue of whether the Code Blue Plan constitutes a security. For the reasons set forth below, the Court will deny Defendants' motion and grant partial summary judgment to Plaintiffs on this issue.

## Background

EYI sells various consumer products, including dietary supplements, fuel additives, and Code Blue water filtration systems – the product at issue in this case. EYI sells its products through a multi-level marketing scheme. That is, it recruits Independent Business Associates ("IBAs") to sell products, and the IBAs in turn recruit additional IBAs, and so forth, resulting in a pyramid-type organizational structure. EYIC and EYI Canada are affiliated with EYI, but their status or relationship to EYI or Plaintiffs' claims is irrelevant for purposes of the instant motion.[1] The Boersemas are top level IBAs for EYI, and apparently recruit IBAs in the West Michigan area.

Plaintiffs are IBAs recruited by the Boersemas to sell EYI products and recruit additional IBAs and, therefore, are in the Boersemas' "down-line" in the pyramid.

The Code Blue Plan provides three ways in which an IBA can make money: (1) resale of Code Blue water filtration systems; (2) commissions based upon the volume of products ordered by the IBA and the IBA's downline; and (3) annual distributions from a profit sharing pool based upon the number of Code Blue systems sold worldwide. This last component is referred to as the

---

[1]In their brief, Defendants assert that EYIC and EYI Canada had no dealings with Plaintiffs. Defendants provide no evidence to support this assertion, and their motion does not request that these Defendants be dismissed on this ground.

"Precious Metals Program." EYI's promotional materials describe the Precious Metals Program as "an opportunity for [IBAs] to share in the world wide annual sales of all EYI Code Blue Systems." (Pls.' Resp. Br. Ex. 2.)  The Precious Metals Program has four different participation levels depending upon the amount of the initial investment: (1) the Platinum level, requiring an initial investment of $5,030.80; (2) the Gold level, requiring an initial investment of $3,045.45; (3) the Silver level, requiring an initial investment of $2,030.30; and (4) the Bronze level, requiring an initial investment of $1,015.15.  The maximum potential distributions from the profit sharing pool vary by level, the highest being at the Platinum level and the lowest being at the Bronze level.  In order to be eligible for profit sharing, an IBA is required to: (1) purchase a Platinum, Gold, Silver, or Bronze package; (2) maintain a monthly minimum business volume; (3) remain current with the annual membership fee; and (4) in each period for determining the distribution, either enroll a new or existing IBA with a Platinum, Gold, Silver, or Bronze package or purchase an additional 108 Code Blue filtration systems.

Plaintiffs purchased the Platinum package, and in exchange for their payment of $5,030.80, received 90 Code Blue systems for resale, along with the right to have EYI place $1.50 per Code Blue filtration system sold into the profit sharing pool.  Plaintiffs were initially entitled to a maximum annual profit sharing payment of $25,000, but EYI subsequently increased this amount to $35,000.

## Motion Standard

As an initial matter, the Court finds it necessary to address the proper basis for Defendants' motion.  Defendants frame their motion as a motion to dismiss for lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), and a motion for summary judgment pursuant to Rule 56.  Although Defendants contend

that the Court lacks jurisdiction because the Code Blue Plan is not a security, lack of jurisdiction is not a proper basis for dismissal because Plaintiffs allege a claim under federal law in their First Amended Complaint for violation of the 1933 Act, which invokes the Court's federal question jurisdiction under 28 U.S.C. § 1331. As one court has observed:

> [W]here the federal claim is not patently frivolous or a mere matter of form, and where the federal law made the basis of the action admits of at least one plausible, even if mistaken, interpretation which would support the action, it appears to be the better approach for the court to assume jurisdiction and adjudge the claimed defects on the grounds that the complaint fails to state a claim upon which relief can be granted.

*Elders v. Consol. Freightways Corp.*, 289 F. Supp. 630, 633 (D. Minn. 1968). *See also Town of W. Hartford v. Operation Rescue*, 915 F.2d 92, 99 (2d Cir. 1990) (stating that "a case that cannot survive a motion to dismiss for failure to state a claim upon which relief can be granted may nonetheless properly be in federal court" (citation omitted)). Because Plaintiffs have alleged a viable claim under the 1933 Act, the proper course is for the Court to assume jurisdiction over the claim in order to determine whether it is legally sufficient.

Defendants' motion also cannot be properly characterized as a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) because Defendant does not argue that Plaintiffs' allegations in their First Amended Complaint are insufficient to state a claim. In fact, nowhere in their brief do Defendants even cite Plaintiffs' First Amended Complaint. Moreover, based upon its review of the First Amended Complaint, the Court notes that Plaintiffs sufficiently allege that the Code Blue Plan constitutes a security that Defendants sold without proper registration.[2]

---

[2] The elements of a claim for violation of Section 5 of the 1933 Act are: "'(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale.'" *SEC v. Lyon*, 529 F. Supp. 2d 444, 453 (S.D.N.Y. 2008) (quoting *SEC v. Cavanagh*, 445 F.3d 105, 111 n. 13 (2d Cir. 2006). The Court does note that while Plaintiffs allege the first two elements, they do not allege the third element, use of interstate transportation or communication and the mails in connection with the offer or sale. However, Defendants do not cite this apparent omission as a basis for dismissal, and it is entirely possible that, if called to Plaintiffs' attention, Plaintiffs would be able to amend in order to address this deficiency.

4

While Defendants' motion appears to be properly considered as a motion for summary judgment, Defendants make a number of factual statements in their brief without providing any evidentiary support for those allegations. *See Shorts v. Bartholomew*, 255 F. App'x 46, 50 (6th Cir. 2007) ("The party moving for summary judgment bears the initial burden and that burden may be satisfied by affirmative evidence that negates an element of the non-moving party's claim or by 'an absence of evidence to support the non-moving party's case.'") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986)). Nonetheless, the materials that Plaintiffs have attached to their response to Defendants' motion provide a sufficient basis for the Court to decide the limited issue before it.

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## Discussion

As mentioned above, the sole issue presented by the instant motion is whether the Code Blue Plan constitutes a security under the 1933 Act. The 1933 Act and the Securities Exchange Act of 1934 contain virtually identical definitions of the term "security." *See* 15 U.S.C. § 77b(1), 15 U.S.C.

§ 78c(a)(10); *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S. Ct. 548, 553 (1967). Apart from the broad array of investment vehicles commonly understood to be securities, such as stocks, bonds, and options, the definition includes any "investment contract." The Supreme Court set forth the well-known test for determining an investment contract in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S. Ct. 1100 (1946):

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

*Id.* at 298-99, 66 S. Ct. at 1103. *Howey* thus specifies three conditions for an investment contract: (1) an investment of money; (2) in a common enterprise; and (3) with the expectation of profits produced solely by the efforts of others. *See Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144, 146 (7th Cir. 1984).

Recognizing the broad remedial scope of the 1933 Act, the *Howey* court remarked that this definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299, 66 S. Ct. at 1103. The investment scheme in *Howey* involved the sale of small tracts of land in a citrus grove. In connection with the sale, the investors were offered a service contract, pursuant to which the defendant leased the property back from the investors in order to cultivate, harvest, and market the crops. Although the investors nominally owned the land, they had no right to enter it and had no right to the fruit. The Court concluded that this scheme involved an investment contract. The Court observed that the defendants were offering investors not merely to sell an interest in land or to perform farm management services, but instead were "offering an opportunity to contribute money and to share in the profits

6

of a large citrus fruit enterprise managed and partly owned by respondents." *Id.* at 299, 66 S. Ct. at 1103.

Defendants contend that the Code Blue Plan is not an investment contract because IBAs could expect to make a profit only from their own sales of the Code Blue water filtration systems that they purchased from EYI, from commissions on products that they ordered, or from the annual division and distribution of the profit sharing pool. Defendants assert that whatever profits Plaintiffs earned would be dependent mostly upon Plaintiffs' own efforts rather than the efforts of others. Rather than an investment, Defendants argue, Plaintiffs' participation in the Code Blue was really nothing more than a purchase of 90 Code Blue water filtration systems, which Plaintiffs were free to resell at retail in order to make a profit.

Plaintiffs concede that the resale of Code Blue systems at a profit and commissions based upon business volume would not constitute an investment contract because the amounts that an IBA would earn from those activities would result from the IBA's own efforts instead the efforts of others. Plaintiffs argue, however, that where a scheme contains various profit making components, it is appropriate to consider each component separately to determine whether it meets the *Howey* test. Plaintiffs note that the profit sharing pool feature of the Code Blue System satisfies the *Howey* test because it provides the ability to make a substantial profit without doing anything beyond purchasing Code Blue filtration systems.

With regard to the first *Howey* requirement, an investment of money, the only reasonable conclusion to be drawn from the undisputed facts is that the $5030.80 that Plaintiffs each paid to EYI for their Platinum level partnerships was an investment.[3] Although Defendants seek to characterize these transactions as merely a sale of product to Plaintiffs at wholesale, Defendants

---

[3] The Court recognizes that the Frenches and the Barkels paid only one membership fee, such that each couple paid a total of $5,030.80.

ignore the fact that in purchasing their memberships, Plaintiffs became entitled to receive a share of profits from the profit sharing pool (initially $25,000 and later increased to $35,000) that was far greater than the profits they could have realized from selling their Code Blue systems, which Defendants acknowledge would have been only about $1,400 had Plaintiffs sold all of their Code Blue systems. As Plaintiffs note, the true motivation for purchasing a membership was the allure of a substantial payout from the profit sharing pool, which Plaintiffs would have received regardless of whether they sold their Code Blue systems. In fact, Plaintiffs could have stored, given away, or thrown away the systems that they purchased and would still be entitled to a distribution from the profit sharing pool, so long as they remained current with the participation requirements.

The second element is a common enterprise. The circuits apply two different tests for determining a common enterprise: horizontal commonality and vertical commonality. Horizontal commonality requires a sharing or pooling of funds in which the fortunes of individual investors are inextricably intertwined with the success of the overall venture. *See Union Planters Nat'l Bank v. Commercial Credit Bus. Loans, Inc.*, 651 F.2d 1174, 1183 (6th Cir. 1981). On the other hand, vertical commonality, a less stringent test, requires only a common venture between the investor and the promoter, where the fortune of the investor depends upon the effort and expertise of the promoter without a pooling of funds. *See id.* at 1183. The Sixth Circuit follows the horizontal commonality approach. *See Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385, 394 (6th Cir. 1989); *Hart v. Pulte Homes of Mich. Corp.*, 735 F.2d 1001, 1003-05 (6th Cir. 1984).

The Code Blue Plan meets the horizontal commonality test. That is, the fortunes of all the Precious Metals Program members were tied to the success of the overall venture, EYI, because the size of the profit sharing pool is dependent upon the number of Code Blue Systems sold by EYI. Thus, larger sales by EYI directly translated into a larger profit sharing fund available for distribution among IBAs.

The final *Howey* element is whether Plaintiffs had a reasonable expectation of profits to be derived solely from the efforts of others. In applying this last element, the Court notes that, when considering an investment scheme involving multiple profit-components, courts have analyzed each component separately in determining the existence of an investment contract. *See Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 782 (9th Cir. 1996); *SEC v. Int'l Loan Network*, 968 F.2d 1304, 1307-08 (D.C. Cir. 1992). This Court concludes that this is the proper approach and will therefore consider the profit sharing pool as a separate component of the Code Blue Plan.

Given the discussion above, there is really no dispute that Plaintiffs had a reasonable expectation of making a profit in the form of a distribution from the profit sharing pool. The question is whether the "solely" from the efforts of others requirement should be read literally. As the First Circuit has observed:

> The courts of appeals have been unanimous in declining to give literal meaning to the word "solely" in this context, instead holding the requirement satisfied as long as "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."

*SEC v. SG Ltd.*, 265 F.3d 42, 55 (1st Cir. 2001) (quoting *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973)). The Sixth Circuit has recognized that this approach is proper in light of the Supreme Court's direction to focus upon the "economic realities" and not give the "solely" requirement a strict reading. *SEC v. Prof'l Assocs.*, 731 F.2d 349, 357 (6th Cir. 1984) (citing *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 95 S. Ct. 2051 (1975)).

In *Glenn W. Turner Enterprises*, *supra*, the defendant sold various self-improvement courses to individuals through a subsidiary called "Dare To Be Great." The purchasers of some of the more expensive courses were allowed to participate in selling the courses to new customers. These purchasers did not sell the courses to others solely through their own efforts, but were permitted to entice new customers to attend the company's sales meetings and, for their efforts, received a

9

percentage of new sales made by the company. The venture was essentially a pyramid plan through which purchasers would continually make money by enticing new customers or participants. In assessing whether this plan met the *Howey* test for an investment contract, the Ninth Circuit was confronted with the issue of whether to give the "solely" language in *Howey* a literal application. In concluding that a literal application would frustrate the remedial purpose of the 1933 Act, that court observed that "[i]t would be easy to evade [the *Howey* test] by adding a requirement that the buyer contribute a modicum of effort." 474 F.2d at 482. The court reasoned that in light of remedial nature of the legislation, the word "solely" should not be given a strict application but instead should be construed with any eye toward the substance, rather than form, of those transactions involving securities. *See id.* In light of these principles, the court said that the critical inquiry is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id.*; *see also SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 483-84 (5th Cir. 1974) (following *Glenn W. Turner* in considering whether another Turner investment scheme was an investment contract).

In the instant case, while it must be conceded that Plaintiffs contributed some effort in connection with the money that went into the profit sharing pool, because EYI deposited $1.50 per system that Plaintiffs purchased, Defendants' efforts were the truly significant efforts required to produce the substantial profits that Defendants held out to Plaintiffs. As Plaintiffs have demonstrated, in order to achieve the potential $35,000 payout to all Platinum level members, EYI would need to sell approximately 1.2 million Code Blue systems. The profit share from the 90 Code Blue systems sold to each Plaintiff would have represented only about $2.55 of the total $35,000 payout to each Platinum member (90 systems x $1.50 per system = $135 (contributed to profit sharing pool)/53 Platinum members). Plaintiffs' purchases thus represented an insignificant amount

10

of the profits that Plaintiffs could have received from the Profit sharing pool. Accordingly, Defendants' efforts in selling a substantial number of Code Blue Systems were "the undeniably significant" ones affecting the success of the venture.

Defendants argue a number of points, such as that the Code Blue Plan was not an illegal pyramid scheme, the Code Blue filtration system is a legitimate product, there was no egregious conduct here as was the case in *Glenn W. Turner*, and the profit sharing payments were not a dividend or any other type of payment tied to the profitability of EYI. These arguments are all beside the point because the Court's inquiry is driven by the *Howey* test.[4] And, as shown above, the application of that test to the undisputed facts in this case shows that the Code Blue Plan was, as a matter of law, an investment contract.

## Conclusion

For the foregoing reasons, the Court will deny Defendants' motion for summary judgment and grant partial summary judgment to Plaintiffs on the issue of whether the Code Blue Plan was a security under the 1933 Act.

An Order consistent with this Opinion will be entered.


Dated: May 13, 2008                             /s/ Gordon J. Quist
                                              GORDON J. QUIST
                                         UNITED STATES DISTRICT JUDGE

---

[4]Defendants also argue that no one ever encouraged Plaintiffs not to sell their Code Blue systems. This argument proves too much, as it implicitly recognizes that after Plaintiffs purchased the Code Blue systems their work was essentially done, at least as far as receiving a profit sharing distribution.